No. 2595

## MACK GREEN v. THE STATE.

1. MURDER—INDICTMENT.—The indictment charged that "Mack Green, on or about the first day of May, 1888, in the county and State aforesaid, did, with malice aforethought, kill Sam Smith by shooting him with a gun; contrary," etc. On motion in arrest of judgment, the indictment is *held* a good indictment for murder, and sufficient to sustain a conviction in the first degree.

2. CHARGE OF THE COURT—MURDER OF THE SECOND DEGREE—MANSLAUGHTER.—In a trial for murder the inculpatory evidence tended to prove that the defendant and his brother waylaid the deceased, and that he was fired upon and killed by one or both of them—both being present and acting together in perpetrating the homicide. According to the defense, the meeting of the deceased with the defendant and his brother was accidental, and the first shot was fired by the deceased at the defendant's brother, who, in self defense, and with no co-operation of defendant, fired upon and killed the deceased. The trial court gave in charge to the jury the law of murder of the first degree, and of justifiable homicide in self defense, but refused to give in charge the law of murder of the second degree and of manslaughter. *Held*, that the charge covered the only issues in the case, and properly omitted the law of murder of the second degree and of manslaughter.

APPEAL from the District Court of Comanche. Tried below before the Hon. T. H. Conner.

At the August term, 1888, of the district court of Comanche county Mack Green, the appellant, was indicted for the murder of Sam Smith by shooting him with a gun on May 1, 1888. A trial was had at the same term, and appellant was found guilty of murder in the first degree, with a life term in the penitentiary assessed as his punishment. His motion for a new trial being overruled he appealed to this court and assigns many errors. The brief and argument of his counsel discloses the fact that his brother Tom was separately indicted for the same offense.

About seventy witnesses were examined in the case, and the record contains a hundred and fifty pages of statement of facts and bills of exceptions. The testimony consists largely of local description and circumstantial details elicited for the purpose

of establishing the presence and participation of appellant in the perpetration of the homicide. Instead of setting out the evidence of the numerous witnesses it is deemed sufficient to select the most important portions, and to give a condensed statement of such material facts as were not contested at the trial below.

Late in the afternoon of May 1, 1888, the dead body of Sam Smith was found in the woods about half a mile from his house which was situate about six miles west from DeLeon, a village in Comanche county. Many gunshot wounds were found on the corpse. John Lewis, a State's witness, testified that he assisted in removing the clothing from the body, and found and examined the wounds. "There were bullet holes above and below one nipple; in the front part of his legs, and two in the back; one on each side of the back bone. There was one shot in his arm. There was a large wound where several shot had entered his head above and back of the ear, and a shot had cut the under part of the ear. All shot were rather large—some buck shot. Shot in the back seemed to have gone in straight."

Describing the indications at and near the body, George M. Phillips, who was one of the first persons who saw it, stated that close to and on both sides of the body he saw the tracks of a small boot or shoe, number five or six in size, with high heels, one of them slightly run down. This track was traced a distance of eighty or ninety yards through some bushes to a point where two horses had stood. Coming from that point toward the body, the track indicated that the person who made it moved in a walk, but that, when he returned to the horses, he moved in a run, and the horses went in a run from that point in a course which would take them a little south of the house of old man Green, the father of the appellant. The witness Phillips saw no other tracks at the body except that of the deceased, which he identified by its size and by the fact that it proceeded no further than to the point at which the body lay. This track indicated that the deceased was proceeding in a direct, straight forward walk until within about three feet of where he fell, where it indicated that the deceased careened or staggered in his walk. That same night the witness saw the appellant and examined his boots for the purpose of comparing them with the tracks seen at the body, and the witness concluded that the small tracks at the body were made by the appellant's boots. The point at which the two horses had stood

was a little west of north from the body. A man on a horse at
that point could have been seen from the body. This witness
thought that the distance from the body to old man Green's
house was about three-quarters of a mile, and about a mile from
said house to the deceased's. In the direction of where the
horses had stood, and twenty or thirty steps from the body, the
witness found a piece of gun wadding, and about two or three
feet north of the body he found a Winchester gun, but did not
examine it.

John Johnson, testifying for the State, said that he was at
his home in the afternoon of May 1, 1888, when a small boy
came from old man Green's and told him that Sam Smith had
been killed. He at once went to Green's, and there found old
man and Mrs. Green, W. C. Burrow and J. W. Martin. Old
man Green told where Smith's body could be found, and wit-
ness, accompanied by Burrow and Martin, started off to find
it. They first went in a northwest direction, but, not finding
it after searching an hour or so, the witness and Martin re-
turned to Green's, and from there they took and followed the
back tracks of some horses to where the body was. They saw
where those horses had stopped. Bellew (usually called Belyeu
in the record) had already found the body, and was the only
person then at it. He hailed the witness and Martin when
they got within a hundred yards or so, and told them he had
found the body. This witness observed the tracks of two per-
sons who had approached the body from the point where the
two horses had stood, but the larger tracks stopped some forty
yards from the body. By the testimony of this and several
other witnesses it was proved that a number of trees and
bushes which intervened between the point at which the horses
had stood and that at which the deceased lay bore the marks of
bullets or shot. Also by this witness and several others the State
made proof that on a hill overlooking the deceased's house, and
about three hundred and fifty or four hundred yards from it
were found the tracks of two horses and the tracks of two men.
The horses had apparently been stopped and hitched a short
distance from a rocky point from which the deceased's house
and premises could be partially seen, and from where the horses
had been hitched the tracks of their riders proceeded to the
said rocky point. One of those tracks was that of a boot or
shoe about a number five or six in size, with high heels, and
the tracks showed that the heel of one of the boots or shoes

was run down. The other track looked like that of a number seven or eight shoe with broad soles and heels. Indications on the ground and bushes where the horses had stood showed that they had been hitched there some time, and that one was a large and the other a small horse. A peculiarity about one of these horse tracks showed that in the hoof which made it there was a gap or broken place which made no impression on the ground. Some of the witnesses testified that a very similar peculiarity was apparent in one of the horse tracks found near the body of the deceased. Several members of the Green family, however, testifying for the defense, denied that there was any such a peculiarity in the hoofs of either of the horses ridden on the fatal afternoon by the appellant and his brother Tom. The trail of the horses was followed by several of the State's witnesses from the rocky hill which overlooked the deceased's house. With the usual amount of discrepancy in such testimony, these witnesses described the course of the trail until it led them to the spot at which two horses had stood near the body of the deceased.

Mrs. M. Smith, the widow of the deceased, testified for the State, that she first heard of her husband's death about half an hour before sunset in the afternoon of May 1, 1888. About the middle of that afternoon he started from his home in a southwest direction, for the purpose, as he said, of looking for his goats, as he was in the habit of doing when they failed to come up in the afternoon. He took with him, as was also his habit, his Winchester gun. Within an hour after his departure from the house, the witness heard the reports of some twelve or fifteen shots, fired in a southerly direction from the house. Deceased and Belyeu had been working on a fence, and deceased, when he left to look for his goats, left Belyeu at the fence.

John Rhoads, for the State, testified that he was the jailer of Comanche county. When the appellant and his brother Tom were brought to the jail from De Leon, the appellant was wearing a pair of small boots, about number five or six, narrow soled, and with high heels, one or both of which were run down. Tom Green was wearing a pair of shoes about number eight in size, with broad soles and flat heels.

E. N. Waldrop, for the State, testified that he saw the appellant and Tom Green at De Leon about sunset of the fatal day.

Tom Green was riding a mare pony. Appellant was riding a horse larger than Tom's pony, and with larger feet.

J. R. Belyeu, testifying for the State, said that when he learned that Sam Smith had been killed he called a man named Taylor and they went to look for Smith. Not finding him soon, witness went back to Smith's house, and from there trailed him by his tracks. The witness described the course of the trail for some seven hundred yards to the spot at which he found Smith's body, and near which he observed the tracks of goats. Some time after Smith left the house to search for his goats, the witness heard twelve or fifteen shots fired in the direction of the place where he found Smith's body. This witness was living with the deceased at the time of the homicide, and they went to De Leon together in a wagon the day before that event. At De Leon the witness met the appellant, who cursed and abused the witness and the deceased, calling them d—d rascals, d—d fools, etc., because they had caused him to be arrested. Part of the time the deceased was near by and heard some of the appellant's talk. Appellant said he would kill the deceased and witness, if he had to take the brush for it. He came up to witness and said: "What in the hell and damnation did you swear out that writ for?" And then followed his abuse already stated. The witness admitted that he had not testified at the examining trial about this abuse, inasmuch as he was not questioned about it. He never heard the deceased say anything about the appellant's abusive language on that occasion, and he denied that he and the deceased, just before they started home, had a conversation in the presence of appellant's brother Frank, in which the deceased said to witness: "Hurry and load the wagon and let's start home, and I will kill the son of a bitch as they go home."

Dr. S. W. Walker, for the State, testified that the day before the homicide he saw the appellant and Tom Green talking to Belyeu in De Leon. Appellant was proposing to whip Belyeu or any friend of his. Deceased, who was standing near by at the time, afterwards got witness to go to the Greens and try to pacify them. Witness told them that the deceased sent them word that he was sick and unable to fight them, and did not want to fight them. Finally the Greens said they would not fight the deceased that day. Witness did not hear the deceased use any bad language about the Greens on that day.

Mrs. Tims, a sister of Belyeu, testified that, the Sunday night

week before the homicide, she attended prayer meeting at the school house and was seated close to the door. Just outside of the door the appellant was talking to some one, and she heard him say that if Smith and Belyeu caused him to pay a fine he would kill them both.

W. M. Littlefield, for the State, testified that Henry Bennett and he were plowing in his field on the day Smith was killed. About the middle of that afternoon they heard the reports of fire arms in the direction of the spot where Smith's body was found. The first and second shots were so nearly simultaneous that he could barely distinguish them apart. Then while it would take a man to walk say twenty or thirty steps, twelve more shots were fired as fast as they could be counted, and then there was a pause and a single shot followed. This single shot was keener and sharper than the previous ones, and seemed to be the report of a rifle. The previous reports sounded like those of shot guns. Witness heard some one in the same direction halloo just after the first two shots, but could not say whether it was a cry of distress or not. Witness was about half a mile distant from where Smith's body was found.

D. J. Rowe, sheriff, speaking of the Winchester gun found near Smith's body, said it had been struck under the barrel by a bullet which tore away a part of the stock. The bullet ranged across the barrel, and struck almost centrally on the magazine. According to this and other witnesses, the gun, when thus struck, could not have been presented, but must have had the muzzle turned upward.

J. J. Wynn, for the State, testified that about the middle of the fatal afternoon he saw the appellant and his brother Tom riding rapidly in an easterly direction towards their father's house. They were going in a more rapid gait than a lope, and went on to old man Green's. By other testimony the State proved that the horse tracks at old man Green's were back-tracked to the place where the two horses had stood near the body of the deceased.

Mrs. Lydia Green, the appellant's mother, was his first witness. She testified that she lived about a mile from the house of Sam Smith, and was at her home the day he was killed. She had been informed about the place at which he was killed. She heard the firing about the middle of the afternoon, and afterwards saw the appellant and his brother Tom riding towards the house from a westerly direction. They were riding in a

fast trot or gallop. They rode up to where their father was standing at the bars in front of the house, and they seemed to be scared or excited. Witness heard of the killing of Smith after the middle of that afternoon. A few days previous she saw him near the southwest corner of her husband's field, in some brush near where some large posts had been put up. The Green boys were then grubbing in the field, and she had taken them some water. Smith was going off, "kinder stooped," through the bushes and from behind a tree. He was about thirty-five or forty yards from the corner of the field, and the boys were some seventy-five yards from the corner, and inside the field. Smith had his gun with him. Appellant and his brother Frank were the boys in the field. Witness was not excited by thus seeing Smith, and did not return to the field and tell the boys, but went on to the house and told her husband, and he went to the field and told the boys. About a week before that occasion, witness's husband had stopped the appellant from plowing to the end of the field nearest the road and brush in the direction of Smith's. Appellant and his brother Tom ate dinner at home the day Smith was killed, and left home about fifteen minutes after two. They went in a northwest direction to hunt for a yearling, and were gone about three quarters of an hour. After they came back Tom loaded his gun. Appellant did not load his gun, which was capped and appeared to have been discharged. It was a muzzle loading gun. Appellant did not take with him his shot pouch or powder pouch when he left to look for the yearling. Witness saw them hanging on the wall after he had gone. He took no pistol with him. He was in the habit of carrying his gun with him    After witness heard the report of fire arms, not more than four or five minutes elapsed before she saw the appellant at the bars in front of the house. After coming home he and Tom remained about half an hour, and then left for De Leon. Tom was riding a bay horse, and the appellant a sorrel which was the larger of the two. When they started to hunt for the yearling they said they were going down on Willow, which route would not take them by Smith's place. Witness was certain they went northwest toward Willow, and did not go southwest towards Sabanno creek, and she was confident they were not gone more than three quarters of an hour.

Bill Green, a brother of appellant, testified that he had stepped the distance to Smith's house from the rocky hill spoken

of by the witnesses for the State, and he found it to be five hundred and eighty steps. From no point on that knoll could all of Smith's house be seen. The roof and part of the wall and door could be seen from the rocky point. The bars could not be seen from there, nor the space between them and the house or yard. Witness did not think that from the knoll a man could be seen going south or southwest from Smith's house. On Sunday before the killing the witness was on the point of the hill. The trees were then in full leaf. Witness's father put him on the trail made by the horses ridden by appellant and Tom when they left old man Green's on the fatal afternoon. John Hargrove and witness's brother Frank accompanied witness on that trail. It went from old man Green's over on Sabanno creek and to the mouth of Willow; then up Willow and back by the DeLeon and Shinoak road, and thence, after leaving the road, it went to the place where the killing occurred. Where the horses had left the tracks to the north of where Smith's body was found, the witness found a bullet in the south side of a black jack tree, and about seven and a half feet above the ground. That bullet appeared to have come from the direction of the body and towards the point where the horse tracks were. In the afternoon of the killing the witness heard fire arms, and in about an hour afterwards he learned of the killing. He was about half a mile from where the shooting occurred. He was familiar with the sounds made by different kinds of fire arms. The first two shots were close together. The first of those two was a rifle shot; witness was positive it was not that of a shot gun. The second and third reports were those of a shot gun. The witness said there was no "nick" in either of the hoofs of the horses ridden by appellant and his brother Tom. On his cross examination the witness said that previous to taking the witness stand he had never told about finding the bullet in the south side of the black jack tree which stood between the deceased's body and the place north of it where the horse tracks were. On the Sunday before the killing the witness and his brother were near the rocky hill southwest of Smith's house. They were horse hunting, and they found the sorrel horse under the hill and in the direction of Smith's house. There was a bay filly which followed the sorrel horse.

Frank Green, for the defense, testified very similarly to his brother Bill, and added that he heard a conversation at De

Leon between Smith and Belyeu the day before the killing, in which Smith told Belyeu to "hurry up and put the things in the wagon and we will kill the son of a bitch this evening." Witness told this to Tom and the appellant the same day. There was no such peculiarities in the horses' hoofs as had been described by several witnesses for the State. This witness stated that he also saw the bullet mark in the south side of the blackjack tree spoken of by his brother Bill, but he said the bullet had bounced out. He had never previously told this fact. He ran his knife into the bullet hole about an inch or an inch and a half. His brother Bill and his brother in law Hargrove were present, but he could not say whether they saw him do so. He told them about his doing so. He made no search for the bullet. He denied that either of the heels of appellant's boots was run down at the time of the homicide. "There was no shot marks in line with Mack's tracks to Smith's; the shot marks were all from direction of Tom's tracks." The witness stated positively that he knew that Mack and Tom did not ride from home to the point of rocks southwest from Smith's house. Witness went on a horse to where the horse tracks were found north of the body, and could not from there see a person standing where the body lay. He then went to where the body lay, and from there he could plainly see a man on horseback where the horse tracks were. Finally he stated that from the horse tracks he could, on horseback, see something at the spot where the body lay, but he could not tell what it was. This witness said that his mother, when she saw the deceased with his gun near the corner of the field, came back to the field and told what she had seen. He said it was not true that she went on to the house and first told her husband about it. "When I said that Tom had told me that he had shot Smith, I meant that Tom had told father and mother, and they had told me. Don't think he ever did tell me."

John Hargrove, for the defense, gave, in the main, much the same testimony as did his brothers-in-law, Bill and Frank Green, but denied that Frank told him, or said in his presence, that he had pried into the black jack tree and discovered that the bullet which struck it had bounced out. Witness and his brothers-in-law took no one else with them to trail the horses. From Smith's body a man on a horse from where the horse tracks were would be visible from the hips upward, but a man standing at the body could not be seen from where the horses stood.

Witness told no one about the finding of the ball in the black jack tree, and never mentioned that fact until in his present testimony.

J. J. Wynn, who had previously testified for the State, was introduced and further examined by the defense as to what transpired after the appellant and Tom rode up to their father's gate or bars in the afternoon of the homicide. He stated that he was about seventy-five yards distant, and old man Green called to him to come by. Witness did so, and old man Green said to him: "My boys have got into trouble with Smith on the hill." Tom spoke up and said that he had killed Smith; that he, Tom, was riding on his horse through the woods and Smith shot at him with his Winchester; that he, Tom, then fired from his horse, jumped to the ground, took a tree on Smith, and ran right up and shot him again. Then the appellant spoke up and said: "Yes, Tom shot him, but Smith shot at him first with his Winchester." Witness went over to Smith's to inform his family. The Green boys did not tell witness where Smith's body was other than "over on the hill." Tom had a breech loading gun, and was working with and unbreeching it. The boys were excited, and Tom was somewhat agitated while making his statement. Appellant's gun was a muzzle loader; witness did not see him load it. Tom did not tell witness of any other shots than those already mentioned. Witness asked him if any one else was at the shooting, and he replied that the woods were full of armed men. He said he got right up to Smith, and knew he was dead.

Mrs. Lydia Green, appellant's mother, was introduced by the defense. She denied that either appellant or his brother Tom told Wynn that the woods were full of armed men, and she did not think that Tom said that he went up to Smith and fired on him. She was certain Tom did not tell Wynn that he was on his horse when he fired his first shot, and that he then took a tree on Smith and fired the other barrel at him. Tom did not tell Wynn that he fired his pistols at Smith; but, after he went in the house, he did say that he discharged one of his pistols and part of another. He did not say where he got his pistols. "They said Mack (appellant) did not shoot." Counsel asked witness what Mack did, and she replied "nothing." Being asked whether Mack held the horses, witness replied: "I suppose so; don't know that they said anything about the horses." Mack was wearing his fine boots; they were a number seven or

eight in size, and no heel was run down. They had since been worn out by appellant's brother Frank. Tom had larger feet than appellant and wore a number eight or nine. Appellant rode the sorrel horse, which was larger than the bay ridden by Tom. The sorrel had no "nick" out of its hoof. On the Thursday evening after the killing the boys (supposedly Bill and Frank Green) told witness they had found where shot from Smith's gun had struck a black jack tree on the east side. When appellant and Tom rode up to their father in front of the house, appellant was in advance, and he told his father that Tom had killed Smith,—that they were riding through the woods when Smith fired on Tom with his Winchester. Appellant did not have on a pistol.

Mrs. Tom Green, appellant's sister-in-law, testified that when Smith was killed she and her husband were living at section house eighteen of the Texas Central railway, for which road her husband was working. On the Monday before the homicide, as she was walking from the section house to old man Green's, the deceased rose up out of the bushes with his Winchester presented. Witness was scared and started to run. Deceased asked her where Tom was. He was eight or ten feet from the road and directly opposite to witness. "He cursed,—said 'd—n it, where's Tom?'" He snapped his gun while he had it presented at witness. This occurred about a quarter of an hour before sunset. Witness told her husband when he returned home the next day about her meeting with Smith, as stated.

Dick Belyeu (alias Bellew), who had already testified for the State, was called and examined by the defense. He testified that a short time before the homicide he had an appointment to meet the appellant at the corner of the field, and was accompanied there by Smith, the deceased, who took with him his Winchester gun. They saw but did not show themselves to the appellant, because he did not come as he agreed to come. Witness does not "propose to answer how he was armed." Witness had never stated in the presence of Jim Crowley that Smith had his gun cocked and said he was just waiting for appellant to get on his (Smith's) land, when he intended to shoot him. Nor did witness tell Wess Bender that Smith and witness went to meet the Green boys, and concealed themselves in the brush, "and when we got there there were so many of them that we thought it was dangerous to tackle them. Bender did not say to me, 'don't you know Smith intended to kill

Mack Green that evening'; and I did not answer that I did not think that he did that evening, but that I would not say what his future intentions were."

Jim Crowley, a boy who had been living at old man Green's since about a month before Smith was killed, and who had previously lived at Smith's, testified for the defense that he had heard Smith say he would kill Mack Green if he ever got a chance. About two weeks before the witness left Smith's he heard Smith and Belyeu say that they went down to the corner of the field to meet the Greens, and Belyeu said that he had his hand on his pistol, and that Smith had his gun cocked on Tom and Mack, but that there were too many of the Greens. Smith, before witness left him, said he was going to run him off the place. Witness had not talked with the Greens about this case.

Wess Bender, for the defense, testified that he was section boss on the railroad, and that Belyeu had worked for him. Since Smith was killed witness asked Belyeu if he did not know that Smith intended to kill Mack Green the evening that he (Belyeu) and Smith went down to the corner of the field. Belyeu replied that he did not think Smith intended to kill Mack that evening, but that he would not say·what Smith intended to do after that. He further said that while they were in the brush he rose to "open up" on the Green boys, but that Smith tugged him by the coat and told him to sit down, saying that there were too many of them to tackle. Witness's brother-in-law was indicted for conspiracy with the appellant to murder Smith. Belyeu did not seem to think that Smith intended to hurt the Green boys.

Hill Logsdon, for the defense, testified that on the Saturday or the Monday before the homicide he saw Smith at De Leon. Smith had something wrapped up in a slicker across his lap; it was four or five feet long, or about the length of a Winchester. Smith was talking about the Greens, and said he had come to town to prevent them from running over the young man who was living at his house, and that for his own protection he carried the thing wrapped up in the slicker. He said he was too old to fight with his fists, and that every time he got near the sons of bitches they went off and would not give him a chance. At that time the witness did not know the Greens, but was now "camping" with them, and they were feeding him and paying all expenses. Until about a month before this trial the witness

told nobody about what he heard Smith say in De Leon, but he informed appellant's brother Bill of it while working with him on the railroad.

After introducing several witnesses who testified that appellant's reputation was good for peacefulness, etc., and that the deceased's was that of a quarrelsome and dangerous man, the defense rested.

For the State, in rebuttal, E. N. Waldrop testified that he was present when Tom Green and appellant came into De Leon and reported the killing of Smith. Witness asked him particularly how it occurred, and Tom replied that he and Mack were riding through the woods when he saw Smith in the act of shooting; that Smith shot and then he shot; that he saw Smith strike his breast, leaning forward; that then he, Tom, jumped from his horse, ran down some thirty yards and fired again. Tom twice said that but three shots were fired, and said that Mack was a witness to the affair. Mack was present and assented to Tom's account of the matter, and sanctioned Tom's statement that but three shots were fired. Mack further said that he was satisfied Smith was dead, but was not certain, as he and Tom did not go nearer Smith than thirty feet.

The State read in evidence the sworn statement made by appellant to the coroner's inquest held the night of the fatal day. It was as follows: "Me and my brother was out cow hunting May 1, 1888. As we come home I saw Sam Smith with his Winchester. He fired on my brother. My brother fired one shot at him while on his horse; then dismounted, advanced to him, Smith. Second shot, my brother was thirty yards from Smith. Smith look like he was falling when my brother fired second shot. Then my brother shot at Smith several times with a pistol. Smith look like he was trying to get his Winchester after falling. My brother had a pistol, 31 caliber. I did not know whether Smith was dead when I and my brother left, or not. Smith fired on my brother without hailing him. My brother was north of Smith when Smith fired on him. The killing taken place in Comanche county, State of Texas." The signature "J. M. Green" appears to the foregoing, and then appears the further statement, to wit: "Gronen (intended for Green) advanced as he shot. Sam Smith went side way ten or twelve feet from where he fell. I, Mack Green, went in three or four feet from Smith when he fell. My brother came in twenty feet of Smith after he fell."

The State proved that Smith, about a month before he was killed, filed a complaint charging appellant and others with cursing and horse running, etc., around Smith's residence, but the complaint was dismissed on account of some informality or defect. The State introduced a number of witnesses who gave the deceased an excellent reputation for peace and quietude. It incidentally appears that old man Green had died since the homicide.

Many circumstantial details of an equivocal or inconclusive character have been omitted in this report, and also a mass of merely cumulative or corroborative testimony; but it is believed that the material and important evidence has been sufficiently presented.

*Hamilton & Presler,* and *Lindsay & Hutchinson,* for the appellant, filed an able and forcible brief and argument.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Eleven bills of exception reserved to rulings at the trial by defendant appear in the record, nine of which are, to our minds, so fully, completely and satisfactorily explained by the learned judge in his notes setting forth the attendant facts and circumstances that it would be both a work of supererogation and a useless consumption of time to recapitulate and discuss them in view of those explanations.

The tenth and eleventh bills were saved to the overruling of defendant's motions in arrest of judgment and for a new trial. They first attacked the validity and sufficiency of the indictment, which instrument is in accordance with approved precedents and forms. The latter motion recapitulated all the supposed errors into which the court had fallen during the progress of the trial.

Two of these errors, and the ones most urgently insisted upon in the oral argument and brief of counsel for appellant, are that the court failed and refused to submit murder of the second degree and manslaughter as issues in his charge to the jury in this case. Upon the statements both of defendant and his brother as to how the homicide occurred, and which statements were in evidence, their meeting with deceased was purely accidental and they were justifiable on the ground of

self defense. According to the testimony of the prosecution, the homicide was a murder by lying in wait—an assassination —and, consequently, murder of the first degree.

These were the only issues in the case, in our view of the facts as shown by the record. This was the view taken by the learned trial judge, and upon the various phases upon which these issues were by the facts required to be submitted we find his charge a full, clear and sufficient exposition of the law of the case.

We have given the record in this case a most thorough and repeated consideration, and we have found no error for which the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*

Opinion delivered February 16, 1889.